IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHNATHAN A. AZAR,

    Plaintiff,

v.

CIVIL ACTION NO.
1:21-cv-04655-SDG-RDC

CITY OF CHAMBLEE, GEORGIA,

    Defendant.

## FINAL REPORT AND RECOMMENDATION

This is an employment discrimination case. Plaintiff Johnathan A. Azar, a Caucasian male, alleges that Defendant City of Chamblee, Georgia unlawfully terminated his employment based on his race. Following discovery, Chamblee moved for summary judgment. (Doc. 40). After summary-judgment briefing was completed, Plaintiff separately moved for leave to file a signed declaration and surreply in opposition. (Docs. 94, 96). For the reasons below, Plaintiff's motions are **DENIED**, and the undersigned **RECOMMENDS** that Chamblee's motion for summary judgment be **GRANTED**.

## I. BACKGROUND

Plaintiff worked as a police officer for the Chamblee Police Department ("CPD") from January 2017 until he was terminated in August 2019 following an

internal affairs ("IA") investigation into his response to an automobile accident. The central dispute concerns the rationale for his termination.

### A. Factual Background [1]

CPD Chief Kerry Thomas was singularly responsible for terminating Plaintiff's employment. However, Chief Thomas's decision represented the culmination of an investigatory process that involved several other personnel, and it was later upheld on administrative appeal. The CPD chain-of-command, as relevant here, is listed at the outset for ease of reference going forward:

- Jon Walker, City Manager (Caucasian)
- Kerry Thomas, Chief of Police (African-American)
- Michael Beller, Assistant Chief of Police (Caucasian)
- Ernesto Ford, Captain & Internal Affairs Commander (African-American)
- Chris Newberry, Lieutenant & Internal Affairs Investigator (Caucasian)
- Jason Waasdorp, Lieutenant & Plaintiff's Supervisor (Caucasian)
- Robert Bodron, Sergeant & Plaintiff's Supervisor (Caucasian)

Each of these individuals either investigated Plaintiff's conduct or reviewed the investigative results.

### i. Plaintiff's Work History

Before arriving at the CPD, Plaintiff had more than a decade of collected

---

[1] The relevant facts are taken from the parties' respective statements of material facts, (Doc. 40-2 [Chamblee's Statement of Material Facts, "DSMF"]; Doc. 84 [Plaintiff's Statement of Material Facts, "PSMF"]), together with other portions of the record as appropriate. Where the parties offer conflicting accounts, the undersigned draws all reasonable inferences and presents all evidence in the light most favorable to Plaintiff as the non-moving party. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012).

experience in law enforcement at various stops. (DSMF ¶ 1). During that time, he received training in, among other things, fair and impartial policing, advanced traffic law, and the use of body-worn cameras ("BWCs"). (*Id.*). And after joining the CPD, he twice received commendation for his work in uniform. (Doc. 47-5).

Plaintiff also had a mostly—although not entirely—clean disciplinary record. For instance, in March 2017, Plaintiff received an eight-hour suspension for failing to qualify during his firearms training. (DSMF ¶ 6). In May 2018, he was cleared of wrongdoing in connection with a citizen encounter following an IA investigation, during which he was subjected to a polygraph test. (DSMF ¶¶ 7, 9; Doc. 43-2 at 8–59). Plaintiff was not wearing his BWC during the May 2018 incident, as required, but received no disciplinary action. (DSMF ¶ 8). In June 2018, Plaintiff struck a vehicle from behind while driving his CPD vehicle and received a letter of counseling from Asst. Chief Beller. (DSMF ¶ 10; Doc. 43-2 at 7). Plaintiff received multiple informal coachings between March 2019 and April 2019 for minor incidents, including failing to follow instructions and improperly handling an arrestee's property; speeding and failing to stop at a stop sign in his CPD vehicle; and failing to fingerprint a shoplifting suspect. (DSMF ¶ 11; Doc. 43-2 at 60–61). Aside from the polygraph test, however, Plaintiff did not believe any of the CPD's responses to the above incidents were racially motivated. (DSMF ¶¶ 12, 41; Doc. 43-1 ["Pl. Dep."] at 32, 34–35, 41, 43, 45–46, 135).

3

### ii. The April 2019 Automobile Accident

Plaintiff's termination stemmed from his response to an automobile accident in April 2019. Here's what happened.

On April 11, 2019, Plaintiff was dispatched to a two-vehicle accident in which injuries were reported. (DSMF ¶ 13; Pl. Dep. at 114). The accident involved Nanda Cherry, an African-American female citizen, and Brandon Puhlman, a Caucasian male officer with the Sandy Springs Police Department ("SSPD"). (DSMF ¶ 13). The accident occurred on a five-lane highway, with four total north and southbound travel lanes split by a single center turn lane. When Plaintiff arrived at the accident scene and exited his patrol car, his BWC recorded SSPD police officers already on site. (Doc. 42, Exh. 27).[2] The officers directed Plaintiff to the vehicles involved (both resting in the southbound travel lanes), noted that Cherry was still seated in her car, and informed Plaintiff that there was a third-party witness standing nearby. (*Id.*).

Puhlman, who had exited his car, then approached Plaintiff and identified himself as one of the drivers. (*Id.*). Plaintiff asked the SSPD officers to remain on scene until his backup arrived and spoke briefly with Puhlman. (*Id.*). He confirmed Puhlman was not injured and collected his identification. (*Id.*). Plaintiff then approached and interviewed the witness. (DSMF ¶ 16; Doc. 42, Exh. 27). The

---

[2] Chamblee manually filed a thumb-drive that included several electronic recordings, including the video footage recorded by Plaintiff's BWC during the accident call. (Doc. 42, Exhs. 27–31).

witness explained that both vehicles had been travelling northbound but turned left to cross the southbound lanes. (Doc. 42, Exh. 27). According to the witness, it appeared that Puhlman had initiated the turn first but Cherry undercut and hit Puhlman's vehicle as they both turned into the southbound lanes. (*Id.*).

Plaintiff then spoke with an SSPD sergeant who had arrived at the scene and, although Plaintiff had not yet interviewed Cherry, he told the sergeant that Cherry was at fault based on the witness statement. (DSMF ¶ 17; Doc. 42, Exh. 27). Roughly seven minutes after arriving, Plaintiff finally approached Cherry, who had remained in her car and was speaking with other police and fire rescue personnel. (PSMF ¶ 12; Doc. 42, Exh. 27). Although Cherry appeared "shook up," Plaintiff didn't immediately ask about her condition but instead requested to see her license. (DSMF ¶ 19; Doc. 42, Exh. 27). He then asked Cherry what happened, and she explained that she had been waiting in the center turn lane facing north, but as she began to turn left across southbound traffic, Puhlman quickly cut in front of her as he executed a U-turn from the northbound travel lanes. (Doc. 42, Exh. 27). Plaintiff then approached Puhlman once again, and asked what happened. (*Id.*). Consistent with Cherry's account, Puhlman explained that he initiated a U-turn from the leftmost northbound travel lane as he was trailing a police target, and as he crossed into the southbound lanes his vehicle was struck on the driver's side by Cherry's car. (*Id.*).

After collecting these initial statements, Plaintiff returned to his patrol car,

turned off his BWC, and called a supervisor to discuss the accident. (DSMF ¶ 22).
During the call, based on Plaintiff's synopsis of the scene, the supervisor agreed with
Plaintiff's initial assessment. (PSMF ¶¶ 14–15; Doc. 46-4 at 102). Plaintiff later
stated that he turned his BWC off because the SSPD officers had disclosed that they
were chasing a target, although he admitted his BWC had already recorded the
officers as well as mention of the SSPD operation. (DSMF ¶ 23; Pl. Dep. at 80–81).
And when Plaintiff finished his call and exited his patrol car, he turned his BWC
back on. (Doc. 42, Exh. 28). He then informed the SSPD sergeant on camera that he
wasn't going to issue a ticket to anyone because both drivers were at fault. (DSMF
¶ 24; Doc. 42, Exh. 28). In doing so, Plaintiff noted that Puhlman initiated his U-
turn from the northbound travel lane rather than the center turn lane. (Doc. 42, Exh.
28).

At that point, the SSPD sergeant asked Plaintiff if his BWC was turned on, and
Plaintiff responded by turning it off a second time. (DSMF ¶ 25; Doc. 42, Exh. 28).
Plaintiff later testified that he turned his BWC off because he believed the sergeant
was going to discuss details of the SSPD operation. (Doc. 51 ¶ 59). While the BWC
was off, the SSPD sergeant told Plaintiff he didn't want any "special treatment" for
his officer, and that if Puhlman was at fault, he should be charged accordingly.
(DSMF ¶ 26; PSMF ¶ 7). When interviewed during the ensuing investigation, the
sergeant explained that he specifically advised against any special treatment because

he sensed Plaintiff might be considering giving preferential treatment to Puhlman. (Doc. 46-4 at 9).

During this second period when Plaintiff's BWC was off, footage from the BWC of another CPD officer who had arrived to assist shows that Plaintiff spent several minutes speaking again with Puhlman and the SSPD sergeant; however, it did not record any further interaction with Cherry. (DSMF ¶ 27; Doc. 42, Exh. 31). Paramedics who treated Cherry at the scene later confirmed that Plaintiff did not re-interview Cherry before presenting her with a ticket. (DSMF ¶ 28).

Plaintiff turned his BWC on for the third and final time when he issued the ticket to Cherry, who was seated in the back of an ambulance at that point. (DSMF ¶ 29; Doc. 42, Exh. 29). Plaintiff cited her for a failure to yield. (Doc. 42, Exh. 29; Doc. 46-4 at 46–47, 51). When Cherry began to object, Plaintiff cut her off and advised that, based on the witness statement, he had concluded she was at fault. (Doc. 42, Exh. 29). He added that he did not "hold roadside court." (*Id.*).

### iii. The Line Investigation

In the weeks following the accident, Cherry submitted written complaints to both Chamblee and Sandy Springs. (Doc. 46-4 at 5, 39–41, 53, 74–78). In her complaint to Chamblee, Cherry insisted that Puhlman was to blame for the accident and she questioned Plaintiff's "integrity," accusing him of neglecting her injuries and ticketing her without first hearing her side of the story. (*Id.* at 40–41). The

complaint prompted a "line investigation" by Lt. Waasdorp and Sgt. Bodron, both of whom supervised Plaintiff. (*Id.* at 5, 57). For its part, the SSPD conducted its own investigation of Puhlman's conduct following Cherry's complaint. (*Id.* at 74–90).

During their investigation, Lt. Waasdorp and Sgt. Bodron discovered that, although the accident call lasted 48 minutes, only about 17 minutes of footage was recorded by Plaintiff's BWC. (*Id.* at 57). The pair met with Plaintiff on June 17, 2019 and informed him of Cherry's complaint. (*Id.*). They advised him that, per CPD policy, an officer must activate his BWC during accident calls and submit written documentation to explain any missing or interrupted footage. (*Id.* at 57, 65). Sgt. Bodron then expressed concern that Plaintiff's accident report didn't match his account of the accident, as articulated in conversations captured by his BWC. (*Id.* at 59). Meanwhile, Lt. Waasdorp was troubled by the fact that Plaintiff at one point stated on camera that he believed both drivers shared responsibility but later, after turning his BWC off and continuing to speak with Puhlman and the SSPD sergeant, he changed his mind and only issued a ticket to Cherry. (*Id.* at 57). Lt. Waasdorp added that Plaintiff's conduct at the accident scene created a "negative" impression of the CPD. (*Id.*). When asked at the interview why he changed his mind and decided to ticket Cherry, Plaintiff stated that he had spoken again with the parties but forgot to reactivate his BWC to record the conversations. (*Id.*). Lt. Waasdorp told Plaintiff that Cherry's ticket would be voided. (*Id.*).

In the following days, Lt. Waasdorp spoke with Cherry and the third-party witness about the accident. (*Id.* at 57–58). And on June 19, 2019, Lt. Waasdorp emailed Plaintiff and advised him that he was "trying to get [the line investigation] finished up." (*Id.* at 56). Lt. Waasdorp requested a written statement from Plaintiff explaining: (1) what he discussed with the SSPD sergeant after he turned his BWC off the second time; (2) what the drivers said when he re-interviewed them off camera; and (3) what information led him to change his assessment of shared responsibility and issue a ticket only to Cherry. (DSMF ¶ 32; Doc. 46-4 at 56). Plaintiff received the email, but he was on leave from June 18 through June 20, 2019. (Pl. Dep. at 168; Doc. 51 ¶ 110). When he returned to duty on June 21, 2019, he prepared a draft statement and emailed it to his attorney for review. (PSMF ¶ 22; Doc. 51 ¶ 112). He did not, however, forward a copy of his statement to Lt. Waasdorp. (DSMF ¶ 33; Pl. Dep. at 102–03). Nor did he inform Lt. Waasdorp that he had sent the statement to his attorney. (Pl. Dep. at 102–03).

That same day, June 21, 2019, without having received Plaintiff's written statement, Lt. Waasdorp updated Asst. Chief Beller on the status of the line investigation. (Doc. 46-4 at 58). In response, Beller informed him that the matter "needed to go [to] internal affairs." (*Id.*; Doc. 47-1 ["Beller Dep."] at 95–96).

### iv. The IA Investigation

Capt. Ford, as IA Commander, assigned the IA investigation to Lt. Newberry.

9

(Doc. 45-1 ["Newberry Dep."] at 28; Doc. 46-4 at 6). As part of his investigation, Lt. Newberry reviewed Cherry's complaint, requested and reviewed written statements from Lt. Waasdorp and Sgt. Bodron, reviewed BWC footage from Plaintiff and another CPD officer who arrived at the scene, spoke with Cherry by phone, interviewed two of the paramedics who treated Cherry, spoke with the SSPD sergeant with whom Plaintiff interacted at the accident scene, spoke with an SSPD investigator, and reviewed a copy of the SSPD's own IA report. (Doc. 46-4 at 6–16). Lt. Newberry also interviewed Plaintiff. (*Id.* at 12–15; Doc. 42, Exh. 30).

After completing the IA investigation, Lt. Newberry noted the following in his lengthy report:

- Plaintiff intentionally turned his BWC off twice during the accident call, and his dash cam was off the entire time. (Doc. 46-4 at 7).

- Plaintiff's BWC footage recorded Puhlman stating on camera that he initiated a U-turn from a lane of travel and crossed the center turn lane where Cherry was located. (*Id.*).

- Plaintiff's BWC footage showed that he initially stated Cherry was to blame for the accident before he had even spoken with her; that he later told the SSPD sergeant both drivers were responsible and neither would be ticketed; and that, after turning his BWC off, he ultimately issued the ticket solely to Cherry. (*Id.* at 7–8).

- The SSPD sergeant sensed Plaintiff was "considering preferential treatment" toward Puhlman, so he advised Plaintiff off camera that he didn't expect any favors for his officer. (*Id.* at 9).

- During Plaintiff's interview, he stated that he re-interviewed Cherry while she was in the ambulance, but two paramedics who treated

10

Cherry at the scene denied that Plaintiff re-interviewed her before issuing her a ticket. (*Id.* at 14–16).

- Based on BWC-recorded statements and the vehicle damage, Plaintiff incorrectly ticketed Cherry. (*Id.* at 14).

- Plaintiff's report of the accident included no photos or witness statements, and the accident diagram was incorrect. (*Id.* at 7).

- After completing its own investigation and reviewing Plaintiff's BWC footage, the SSPD ultimately concluded Puhlman was at fault. (*Id.* at 9, 91).[3]

- Plaintiff agreed his actions could be construed as biased, and he acknowledged that he issued "the wrong charge." (*Id.* at 14).

- Plaintiff provided a copy of the email he sent to his attorney, but he did not submit a copy of the written statement itself.[4] (*Id.* at 14–15, 106).

---

[3] Copies of the SSPD investigation documents included in Lt. Newberry's IA report show SSPD investigators initially concluded in April and May 2019 that Puhlman was being truthful in his account of the accident and that Cherry was at fault. *See* (Doc. 46-4 at 74–90). However, there is evidence that the SSPD ultimately concluded Puhlman was at fault after reviewing statements recorded by Plaintiff's BWC. (*Id.* at 91).

[4] Plaintiff testified that he electronically forwarded the email along with a copy of the attached written statement to Lt. Newberry during or shortly after his interview. (Pl. Dep. at 147–49, 189–90, 195). However, Lt. Newberry testified that Plaintiff never submitted the statement, his IA report indicates that Plaintiff never submitted the statement, and the statement was not included in the IA report. (Doc. 46-4 at 15, 17; Newberry Dep. at 40). Further, Chamblee submitted a declaration from its Director of Information Technology confirming that Plaintiff never forwarded the email to any Chamblee email account. (Doc. 40-6; DSMF ¶ 35; PSMF ¶¶ 28–29). It is worth noting that, during Plaintiff's interview, Lt. Newberry specifically asked Plaintiff to print out and submit a hard-copy—not an electronic copy—of the email he sent to his attorney. (PSMF ¶ 24; Doc. 42, Exh. 30 at 58:51–1:00:35). Plaintiff agreed, and a copy of the email (but not the statement) is included in the IA report. (Doc. 46-4 at 106). In any case, as explained below, what matters for present purposes is not whether Plaintiff believes he forwarded the statement, or even whether he actually did so, but whether Chief Thomas—who made the termination decision—believed he had forwarded it. And on that score, there is no dispute that, after reviewing the IA report, Chief Thomas believed Plaintiff did not provide the written statement despite having been ordered to do so. *See* (Doc. 48-1 ["Thomas Dep."] at 89–90, 100, 137–38; Doc. 48-5 at 4).

Based on his review of the evidence, Lt. Newberry concluded that Plaintiff committed four separate violations of CPD policies. (DSMF ¶ 36).

First, according to Lt. Newberry, Plaintiff violated the BWC policy by intentionally turning off his BWC twice during the accident call without a legitimate explanation. (Doc. 46-4 at 17). Second, he neglected his duty to "fairly and impartially" investigate the accident because he concluded Cherry was at fault before collecting all the evidence. (*Id.* at 18). Third, he "displayed conduct that diminishe[d] police legitimacy" during his interactions with Cherry, based on his "inconsiderate and unprofessional" demeanor. (*Id.*). And fourth, Plaintiff breached his duty to cooperate with an investigative proceeding when he failed to provide a written statement to Lt. Waasdorp during the initial line investigation. (*Id.*). At his deposition, Lt. Newberry explained that his biggest concern at the conclusion of the investigation was that Plaintiff may have been biased in favor of Puhlman, a fellow officer, while ultimately (and incorrectly) ticketing Cherry. (Newberry Dep. at 47–48, 138–39).

### v. *Plaintiff's Termination*

After completing the IA investigation, Lt. Newberry forwarded a copy of his report and findings to Capt. Ford. (Newberry Dep. at 165). Ford reviewed and approved Lt. Newberry's findings, but made no recommendation regarding disciplinary action. (Doc. 46-1 ["Ford Dep."] at 40, 77, 162–63). The IA report then

went up the chain to Asst. Chief Beller. Beller likewise approved the findings and, based on the totality of the circumstances and "seriousness of the offense," recommended that Plaintiff be terminated. (Beller Dep. at 45, 61–62).

Chief Thomas reviewed the IA report and decided that termination was appropriate given the nature of Plaintiff's violations. (Thomas Dep. at 88–89, 99–102). So, on August 1, 2019, Chief Thomas issued a lengthy, six-page termination letter to Plaintiff. (DSMF ¶ 39; Doc. 48-5). In the letter, Chief Thomas detailed several specific findings supporting his decision, all of which had been registered by Lt. Newberry in the IA report. (Doc. 48-5). For instance, Chief Thomas noted that Plaintiff failed to record nearly two-thirds of the accident call because he twice turned off his BWC; that, notwithstanding inconsistent accounts of the accident at the scene, Plaintiff's BWC recorded Puhlman admitting he initiated a U-turn from the northbound travel lane; that Plaintiff failed to check on Cherry's well-being for several minutes after arriving at the scene, even though he knew injuries had been reported; that Plaintiff stated in his interview with Lt. Newberry that he re-interviewed Cherry but evidence showed the contrary; that Plaintiff didn't adequately explain why he changed his mind and decided to ticket Cherry; and that Plaintiff failed to provide a written statement. (*Id.*). Chief Thomas concluded Plaintiff's actions appeared biased and "damaged public trust." (*Id.* at 5–6).

Plaintiff appealed Chief Thomas's decision to Walker, the City Manager, who

upheld the termination. (DSMF ¶ 40; Doc. 40-3).

### B. Procedural History

Plaintiff initiated this action in the Superior Court of DeKalb County, Georgia in July 2021. (Doc. 1-1). Months later, in November 2021, Defendant timely removed the matter to this Court. (Doc. 1). In his Complaint, Plaintiff alleges that he was terminated on the basis of his race, in violation of Title VII, 42 US.C. § 2000e *et seq.* (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count II), and 42 U.S.C. § 1981 (Count III). (Doc. 1-1).

After discovery concluded, Chamblee moved for summary judgment. (Doc. 40).[5] Plaintiff made 39 separate filings in response, (Docs. 50–88), all but 12 of which were late.[6] Among the timely filed items is the unsigned declaration of Sgt. Bodron. (Doc. 54). In response to Plaintiff's deluge of filings, several of which were marked as "corrected," the undersigned ordered him to file a concise index specifically identifying those documents he wished the Court to consider in connection with Chamblee's motion for summary judgment. (Doc. 90). The

---

[5] The undersigned struck Chamblee's initial motion for summary judgment because the City included more than double the permitted allotment of facts in its Statement of Material Facts. (Docs. 36, 39). Chamblee was ordered to re-file conforming summary-judgment documents, and it did so. (Doc. 40).

[6] Per an extension Order, Plaintiff was given until September 28, 2022 to file his summary-judgment response. (Doc. 49). Plaintiff's complete response consisted of 12 items filed on September 28, 2022, (Docs. 50–61); 21 items filed on September 29, 2022, (Docs. 62–82); 3 items filed on October 5, 2022, (Docs. 83–85); and 3 items filed on October 6, 2022, (Docs. 86–88).

undersigned expressly advised Plaintiff that he would be given "one opportunity" to clarify matters, and that any filings not identified in the index "[would] be ignored" during the Court's review. (*Id.*). Plaintiff filed an index as ordered, (Doc. 91), but three weeks later he moved for leave to file a signed copy of Sgt. Bodron's declaration. (Doc. 94). And two weeks after that, Plaintiff moved for leave to file a summary-judgment surreply. (Doc. 96).

At this point, all motions are ripe for review.

## II. LEGAL STANDARD

A reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary

judgment." *Clark*, 929 F.2d at 608.

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If, in response, the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000).

Genuine issues in dispute are those for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "In determining whether genuine issues of material fact exist, [the reviewing court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." *Rice-Lamar*, 232 F.3d at 840 (citing *Anderson*, 477 U.S. at 255). When the record "taken as a whole" could not lead a rational trier of fact to find for the non-movant, however, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION

Some prefatory remarks are in order based on the arguments and evidence

16

presented. Here is what this case is not. It is not about who was a fault in the automobile accident. It is not about the reasonableness of Plaintiff's conduct at the accident scene. It is not about the soundness of the IA report's conclusions. It is not about the wisdom of Chief Thomas's ultimate decision to terminate. It is not a roving audit of CPD's employment practices. And, finally, it is not an appraisal of Plaintiff's character, talents, or career. Instead, this case is *only* concerned with the narrow question of whether the August 2019 decision to end Plaintiff's employment was unlawfully motivated by his race. Obviously, evidence touching on some of the above topics may fall within the ambit of the Court's review. However, that review must be focused with the preceding caveats in mind.

### A. Preliminary Matters

But first, before turning to the merits, there are a couple of matters raised by Plaintiff that should be addressed at the outset. Plaintiff has moved to file an out-of-time signed declaration from Sgt. Bodron, one of Plaintiff's supervisors who participated in the initial line investigation. (Doc. 94). He has also moved to file a surreply responding to evidentiary objections raised by Chamblee. (Doc. 96). Both motions are due to be denied.

### i. Sgt. Bodron's Declaration

As described above, Sgt. Bodron, along with Lt. Waasdorp, conducted the initial line investigation into Plaintiff's conduct. Sgt. Bodron reviewed Plaintiff's

accident report and BWC footage, and in a written statement to Lt. Newberry during the ensuing IA investigation, he noted concern that Plaintiff's accident report did not match statements recorded by his BWC. (Doc. 46-4 at 59). That was the extent of Sgt. Bodron's involvement in the operative events underlying this case.

Yet, in response to Chamblee's motion for summary judgment, Plaintiff filed an unsigned 30-page declaration from Sgt. Bodron. (Doc. 54).[7] Not surprisingly, Chamblee pointed out the lack of signature in its reply, filed on October 26, 2022. (Doc. 92 at 7). Plaintiff then filed the instant motion for leave to present the signed copy of Sgt. Bodron's declaration on November 4, 2022, which was more than *two months* after Chamblee filed its motion for summary judgment, more than *five weeks* after Plaintiff's summary-judgment response was due, and more than *one week* after Chamblee filed its reply. It was also, importantly, *three weeks* after Plaintiff filed his summary-judgment index in response to the undersigned's Order, which had warned him that "filings not identified in the index will be ignored." (Doc. 90).

Plaintiff has not adequately justified the delay in filing. To be sure, the

---

[7] Plaintiff acknowledged the deficiency at that time, though not overtly. In his own declaration, while noting the absence of a signature on Sgt. Bodron's declaration, Plaintiff states that he reviewed Sgt. Bodron's unsigned declaration and can "attest to all but a few of the facts asserted." (Doc. 51 ¶ 153). He adds that, if Sgt. Bodron were subpoenaed to testify, "he would testify to the same facts as are contained in his [unsigned] Declaration." (*Id.*). Rule 56 requires that a declaration be "made on personal knowledge." Fed. R. Civ. P. 56(c)(4). If Plaintiff himself had personal knowledge of "all but a few of the facts asserted" in Sgt. Bodron's declaration—and, having reviewed St. Bodron's declaration, that is doubtful—he should have explicitly included those facts in his own declaration. Instead, Plaintiff purports to use his own voice to present someone else's unsworn testimony. That is not permitted.

undersigned's Order contemplated the filing of additional items with "the Court's prior express approval," but the only explanation Plaintiff offers for the delay is that Sgt. Bodron, now a police officer in another precinct, had to "suddenly" work night and day for multiple weeks in a row. (Doc. 94 at 2–3). That's it. The undersigned recognizes that officers like Sgt. Bodron have important work to do, work that often results in unpredictable schedules and excessive time demands. However, Plaintiff has not elaborated on what steps he and his counsel actually took to obtain Sgt. Bodron's signature. Nor has he provided an affidavit from himself, his counsel, or Sgt. Bodron explaining in any detail why it proved so difficult for so long. The extent of the delay here demands more. *See* Fed. R. Civ. P. 6(b)(1) (permitting time extensions for good cause); *Ryder Truck Rental, Inc. v. Logistics Res. Sols., Inc.*, No. 21-21573, 2022 WL 2658986, at *3 (S.D. Fla. Apr. 12, 2022) (denying request to file out-of-time affidavits in opposition to summary judgment for lack of good cause showing).

In any event, the probative value of Sgt. Bodron's declaration is minimal given that most of its statements are conclusory and speculative. Rule 56(c) states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). With limited exception, however, Sgt. Bodron's statements run

afoul of this rule. As noted, Sgt. Bodron's role in the underlying events was minimal; nevertheless, he baldly declares that "[w]hile many things go into a decision to destroy an officer's 12-year police career, [Plaintiff]'s circumstances and discipline cannot be explained or understood without the motivating influence of race." (Doc. 94-2 ¶ 51). And although Sgt. Bodron did not participate in the decision to terminate Plaintiff, he goes on to state: "I agree that [Plaintiff] would not have been terminated but for his race (white)—i.e., race was one of the motivating factors that resulted in the decision to terminate him rather than give him a second chance." (*Id.* ¶ 4).

Sgt. Bodron also gives his opinions on a range of matters, including Chief Thomas's qualifications to lead the CPD, the propriety of the IA investigation, Plaintiff's character, the reasonableness of Plaintiff's conduct at the accident scene and during the ensuing investigation, the validity of the IA report's conclusions, and the wisdom of Chief Thomas's termination decision. *See* (*id.* ¶¶ 8–9, 15, 17–19, 21, 23–27, 29–31, 33, 35–38, 40–42, 45–46, 48, 50–51). He concludes with the following:

> Chamblee PD management was definitely not color-blind. Race was taken into account for promotions, task assignments, and discipline, at a minimum. African Americans and non-whites were treated better than whites with respect to discipline and promotions.

(*Id.* ¶ 61). Insofar as any of these and other statements in Sgt. Bodron's declaration are based on personal knowledge at all, they reach too far beyond it and lack the

type of supporting details necessary to merit consideration.[8] *See James v. City of Montgomery*, 823 F. App'x 728, 731–32 (11th Cir. 2020) (affirming district court's exclusion of the plaintiff's affidavit statements regarding her employer's alleged discriminatory practices because the statements "were conclusory allegations that had no probative effect because they were not based on specific facts"); *Jones v. Spherion Atl. Enter., LLC*, 493 F. App'x 6, 9 (11th Cir. 2012) (explaining that "conclusory position[s]" and "vague observations[s]," which do not explicitly refer to specific details, do not create a question of material fact precluding summary judgment); *Parrott v. PNC Bank, Nat'l Ass'n*, 986 F. Supp. 2d 1263, 1271 (N.D. Ala. 2013) (explaining that, under the Federal Rules of Evidence, lay opinions are only admissible if an adequate foundation has been established, meaning that the nature and extent of the witness's contacts and observations should be "as detailed as possible" (citations omitted)).

In sum, Plaintiff hasn't adequately explained why it took so long to submit a

---

[8] Many of Sgt. Bodron's general statements are qualified to his own experience and observations at the CPD, but that qualification is not enough to fortify his opinions. For instance, he believes race was "a motivating factor" in Chief Thomas's hire, but he had no role in the selection. (Doc. 94-2 ¶ 8). He also "suggest[s]" the Court look at the disciplinary records of a few other specific CPD officers whom he believes were treated more favorably than Plaintiff, but he does not articulate how those other officers were treated differently, whether their respective circumstances were analogous to those presented here, or who made the disciplinary decisions in each case. *See* (*id.* ¶¶ 57–58). Indeed, while Sgt. Bodron states that "[t]here are many examples I have come to know of from working at Chamblee, where non-white officers engaged in similar or worse actions than those [Plaintiff] is accused of," he openly concedes he does "not have personal knowledge of each of these events." (*Id.* ¶ 57).

signed copy of Sgt. Bodron's declaration, and the declaration generally lacks probative effect in any event. For these reasons, Plaintiff's motion for leave to file Sgt. Bodron's signed declaration out of time is **DENIED**. And because Sgt. Bodron did not sign the declaration that was timely filed, the undersigned will not consider it in evaluating Chamblee's motion for summary judgment.[9]

### ii. Plaintiff's Surreply

Next, Plaintiff has moved to file a surreply in opposition to evidentiary objections raised by Chamblee. Plaintiff presented two declarations in opposition to summary judgment—one from himself, and (as just discussed) one from Sgt. Bodron. (Docs. 51, 54, 94-2). Chamblee has objected to the Court's consideration of both. (Docs. 92, 95). According to Chamblee, Plaintiff's declaration is nothing more than a "sham," while Sgt. Bodron's declaration was untimely filed and consists largely of inadmissible conclusions, opinions, beliefs, and hearsay. So, Chamblee continues, the declarations should be disregarded when evaluating its motion for summary judgment.

The undersigned finds no need to permit additional briefing on these matters. A court "may in its discretion permit the filing of a surreply." *Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005). However, it should

---

[9] *See Orr v. Orbis Corp. (Wisconsin)*, 1:07-CV-2653-TWT-SSC, 2010 WL 3368124, at *3 (N.D. Ga. July 30, 2010) (declining to consider unsigned and undated declarations on summary judgment) (collecting cases), *R & R adopted*, 2010 WL 3368119 (N.D. Ga. Aug. 23, 2010).

do so only "where a valid reason for such additional briefing exists." *Id.* Here, no such reason is present. The undersigned finds that Plaintiff's declaration is not merely a sham. Only the most transparently contradictory declarations are disregarded as shams, and Plaintiff's declaration—even if not perfectly consistent—does not qualify. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953–54 (11th Cir. 1986) (explaining that the sham affidavit rule only applies to inherent, unexplained inconsistences that cannot be reconciled, not to discrepancies that merely create an issue of credibility that goes to the weight of the evidence). Chamblee's argument to the contrary having thus been rejected, it requires no response. As for Sgt. Bodron's declaration, Plaintiff had ample opportunity to make his case for admissibility in his own motion, discussed immediately above.

Accordingly, Plaintiff's motion for leave to file a surreply is **DENIED**.

### B. Plaintiff's Race-Discrimination Claims

Moving on to the merits, Plaintiff claims his termination violated three separate anti-discrimination laws—Title VII, the Equal Protection Clause of the Fourteenth Amendment, and Section 1981. Title VII creates its own cause of action, but the Fourteenth Amendment and Section 1981 (with respect to state governmental actors) do not. *See* 42 U.S.C. § 2000e-5(f)(1); *Bryant v. Jones*, 575 F.3d 1281, 1288 (11th Cir. 2009). Instead, a plaintiff suing for violations of those laws must move forward under 42 U.S.C. § 1983, which creates a general civil cause of action for

violations of federal law. *See Bryant*, 575 F.3d at 1288; *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989). The basic legal elements for each discrimination claim are identical. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). However, there is no vicarious liability under Section 1983. *See Bryant*, 575 F.3d at 1299 ("It is well established that liability in § 1983 cases cannot be premised solely upon a theory of *respondeat superior*."). For that reason, in order to hold a municipal employer liable under Section 1983, a plaintiff must show that the municipality itself—through, as relevant here, a policy or custom—is responsible for the unlawful discrimination. *See Lewis*, 934 F.3d at 1190.

The following discussion starts with Plaintiff's Title VII claim before turning to his Section 1983 claims.

### i. Title VII

Plaintiff alleges that Chief Thomas's decision to terminate his employment was motivated, at least in part, by his race. Plaintiff has presented no direct evidence of a discriminatory motive, so he relies on circumstantial evidence—principally in the form of comparator disciplinary records—to create an inference of same. According to Plaintiff, that evidence shows he was disproportionately punished as compared to non-Caucasian officers, thus establishing a "convincing mosaic" of unlawful discrimination in support of his claim.

In its motion for summary judgment, Chamblee argues that Plaintiff has failed

to make out a *prima facie* case of discrimination under the *McDonnell Douglas* framework[10] because none of his proposed comparators was similarly situated. Even so, Chamblee continues, it has shown Plaintiff's termination was backed by legitimate reasons that he failed to rebut. As for Plaintiff's convincing mosaic theory, Chamblee insists that Plaintiff has not presented enough relevant evidence to sustain his charge of intentional discrimination.

The undersigned agrees with Chamblee. When a plaintiff relies on circumstantial evidence, as is the case here, he may survive summary judgment through either of two paths. He may present sufficient evidence to work his way through the familiar *McDonnell Douglas* burden-shifting framework. *See Lewis*, 934 F.3d at 1185; *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022). Or, alternatively, he may present enough "bits and pieces" of evidence to portray a convincing mosaic of intentional discrimination. *See Lewis*, 934 F.3d at 1185. But whether operating under the *McDonnell Douglas* framework or the less-rigid and more holistic mosaic standard, the plaintiff's ultimate burden is the same—namely, to present enough evidence that a jury could reasonably conclude he was unlawfully discriminated against. *See Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012).

After careful review of the evidence and arguments, the undersigned

---

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

concludes that Plaintiff's claim breaks down for three independent (though related) reasons—first, he has failed to make out a *prima facie* case; second, he has failed to show Chamblee's rationale for ending his employment was pretextual; and third, he has also failed to present enough collected evidence to portray a convincing mosaic of race discrimination.

### a. McDonnell Douglas Burden Shifting Framework

To state a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, a plaintiff must show that (1) he belonged to a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified to perform the job in question, and (4) the employer treated similarly situated employees outside his class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*). With Chamblee conceding the first three *prima facie* elements, the present debate centers solely on the fourth.

Regarding the requirement that a plaintiff show similarly situated employees outside his protected class were treated more favorably, the Eleventh Circuit has explained that the plaintiff and any comparators must be similar in "all material respects." *Id.* at 1226–28. That means that, as compared to the plaintiff, a similarly situated comparator ordinarily (i) will have engaged in the same basic conduct (or misconduct), (ii) will have been subject to the same employment policy, guideline, or rule, (iii) will have served under the same supervisor, and (iv) will share the

plaintiff's employment or disciplinary history. *Id.* at 1227–28. In short, to satisfy the fourth *prima facie* element, a plaintiff and his comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (citation omitted).

In his response materials, Plaintiff has presented the disciplinary records of 50 current or former CPD officers, but he has failed to show that any of them were similarly situated in all material respects. Therefore, he has failed to make out a *prima facie* case. *See Lewis*, 918 F.3d at 1229. As an initial matter, Plaintiff only identifies six comparators by name or specific conduct in his summary-judgment response brief and corresponding Statement of Material Facts. *See* (Doc. 83-1 at 8 n.20; Doc. 84 ¶¶ 37, 49); *see also* (Doc. 1-1 ¶¶ 51–53). Regarding the rest, Plaintiff merely directs the Court's attention to their collected disciplinary records, a chart listing what he believes are the pertinent details, and a collection of "highlights," before summarily concluding that "African Americans and whites are not treated the same when it comes to discipline interpretation of policies and other employment decisions." (Doc. 83-1 at 18). It should go without saying that "point-and-conclude" is not an acceptable form of argument. *See RTC v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. . . . [r]ather, the onus is upon the parties to formulate arguments." (citation

omitted)); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record."); *Stevenson v. Delta Air Lines, Inc.*, No. 1:16-cv-2571-AT-LTW, 2021 WL 2677018, at *2 (N.D. Ga. Apr. 13, 2021) (explaining that comparator evidence is inadequate where the plaintiff "simply lists their names with no explanation regarding how or why [he] contends these individuals are comparators"), *R & R adopted*, 2021 WL 5168274 (N.D. Ga. Sept. 29, 2021). It is up to Plaintiff, not the Court, to make his case. With that said, the undersigned will address only the six comparators pinpointed by Plaintiff in his response brief.[11]

Plaintiff argues that the following African-American or non-Caucasian CPD officers were similarly situated to him but treated more favorably: (1) Romero Graham; (2) Ronald House; (3) Steven Jackson; (4) Lestat Weston; (5) Craig

---

[11] As noted, Plaintiff provided a chart and a collection of comparator highlights purporting to summarize the contents of hundreds of pages of officer disciplinary records that he separately provided. (Docs. 55, 85). Such summaries are permitted under Federal Rule of Evidence 1006, even at the summary judgment stage. *See Brandon v. GlaxoSmithKline, LLC*, No. 7:15-cv-1804, 2017 WL 2876184, at *7 (N.D. Ala. July 6, 2017). However, "[f]or a summary to be admitted in court as substantive evidence, the proponent must provide a proper foundation for its admission, which should include the testimony of the witness who prepared it or supervised its preparation." *Id.*; *see also Loiseau v. Thompson, O'Brien, Kemp & Nasuti, P.C.*, 499 F. Supp. 3d 1212, 1221 (N.D. Ga. 2020) (explaining that a summary chart must be properly introduced through the testimony of a witness who supervised its preparation, and must also be accurate and non-argumentative). Here, Plaintiff does not appear to have presented any testimony either regarding the chart and highlight's preparation or otherwise confirming their accuracy and completeness, and the highlights are clearly argumentative. For these reasons, the undersigned has not considered these items. *See Brandon*, 2017 WL 2876184, at *8. Nevertheless, as explained in the main text above, because Plaintiff has simply directed the Court's attention to these items without otherwise identifying the salient information therein, he hasn't shown why they merit the Court's consideration in any case.

Wright; and (6) Lancanmaren Johnson. Each will be discussed in turn.

- ***Romero Graham***. In December 2020, Graham accidentally struck a fleeing shoplifting suspect and failed to activate his BWC during the incident. (Doc. 74-5 at 1–2). The suspect later acknowledged that Graham did not intentionally strike him. (Doc 40-4 at 13). After an IA investigation, Chief Thomas issued a written reprimand and eight-hour suspension without pay for violating CPD's use of force, vehicle pursuit, and BWC policies. (Doc. 74-5 at 1–2; Doc. 74-9).

- ***Ronald House***. House received Personnel Conduct Reports ("PCRs")[12] for various policy violations before Chief Thomas was appointed, and he was suspended for 16 hours without pay in 2021 for BWC and dash-cam violations. (Doc. 75-5). House had not been cited for camera violations prior to 2021 and, based in part on a written statement he provided, an investigation concluded that the violations were not intentional. (*Id.* at 2–3). Asst. Chief Beller, who was serving as acting Chief at the time while Chief Thomas was on medical leave, issued the suspension. (*Id.* at 5).

- ***Steven Jackson***. In July 2018, prior to Chief Thomas's appointment, Jackson received a PCR when his dash-cam video recorded him say "this Nigga ain't stopping" while speaking on the phone to a Chamblee dispatcher. (Doc. 76-15 at 3–4). Jackson was referring to a motorist while in pursuit, and he was alone in his patrol car at the time. (*Id.* at 3). In April 2019, Jackson was issued a PCR and written reprimand for failing to use his BWC and using inappropriate language towards a citizen shortly after an accident investigation concluded. (*Id.* at 1–2). Asst. Chief Beller signed off on Jackson's disciplinary action, but Chief Thomas was not involved. (Thomas Dep. at 119–21). In June 2019, Jackson was counseled by a supervisor for again using profane language, this time during an encounter with a suspect after which he appropriately deployed his taser to subdue the suspect. (Doc. 76-8).

- ***Lestat Weston***. In 2020, Chief Thomas suspended Weston for 80 hours, relieved him of his field training duties, and issued a last chance agreement following an IA investigation into a civilian complaint alleging that Weston

---

[12] PCRs are generally issued by an officer's supervisors and not by the Police Chief. (Doc. 40-4 ¶ 7). And, according to Chief Thomas, he rarely had knowledge of PCRs at the time of issuance. (*Id.*).

had tried to pursue a romantic relationship with a domestic violence victim after responding to a call at the victim's home. (Doc. 80-2 at 15–19). In November 2021, an IA investigation was completed following additional complaints of inappropriate and harassing conduct towards women, in violation of his last chance agreement. (*Id.* at 3–14). Chief Thomas terminated Weston a month later, in December 2021. (*Id.* at 1–2).

- ***Craig Wright***. As relevant here, Wright committed multiple BWC violations between March 2020 and May 2020. (Doc. 80-10; Doc. 80-11; Doc. 80-14). He received counseling, warnings, and a four-hour suspension for these violations before Chief Thomas terminated him in May 2020 after an IA investigation determined that he manually disabled his dash-cam while driving to avoid detection as he sped on the interstate. (Doc. 80-9; Doc. 80-11; Doc. 80-12; Doc. 80-14).

- ***Lancanmaren Johnson***. In January 2018, prior to Chief Thomas's appointment, Johnson received a verbal warning and 24-hour suspension after she used profane language and failed to ensure her BWC was operating during an arrest. (Doc. 79-6 at 1–2). Chief Thomas terminated her in 2020 after an investigation determined that she had participated in a scheme to sell accident reports. (Thomas Dep. at 46; Doc. 79-4).

For a variety of reasons, none of these individuals is a suitable comparator.

Most obviously, the operative misconduct in each of the above cases is materially different than the actions for which Plaintiff was terminated. As the IA report, Lt. Newberry's testimony, and Chief Thomas's termination letter detail, a principal concern in Plaintiff's case was that he not only violated multiple CPD policies and incorrectly ticketed a citizen, but that he may have done so for biased reasons. By contrast, the comparators above each committed misconduct of various measure but none were accused of or found to have preferentially imposed legal consequences on a citizen. That is significant.

Moreover, the only common policy implicated in this case and most of the comparator evidence is the BWC policy, but again, even there Plaintiff's conduct can reasonably be distinguished. Notably, only one comparator—Craig Wright— was found to have intentionally disabled his BWC, as Plaintiff had done. Moreover, Wright did so just once on a call response during which no one was ticketed or arrested, (Doc. 80-10), while Plaintiff did so twice while concurrently committing multiple other violations. And, critically, Plaintiff elected to issue a ticket only *after* doing so. Furthermore, the conduct perhaps most like Plaintiff's in this regard—*i.e.*, Wright's intentional disarming of his dash-cam to avoid detection while he sped in his patrol car—also led to termination by Chief Thomas. Finally, much of the disproportionately modest disciplinary action that Plaintiff relies on to generate an inference of discrimination wasn't even issued by Chief Thomas, the sole decisionmaker in this case. In several instances, the misconduct was dealt with before Chief Thomas was hired or while he was on medical leave, or it never even reached his desk.

To rehash a bit while drilling down further on each comparator, Graham was reprimanded and suspended by Chief Thomas without pay after he accidentally struck a fleeing suspect with his patrol car and failed to activate his BWC. As compared to Plaintiff, Graham's BWC violation was inadvertent and there was no suggestion that Graham's conduct toward the suspect was tainted by bias. House

was suspended by Asst. Chief Beller—*not* Chief Thomas—for multiple BCW violations, but unlike Plaintiff, he provided a written explanation during the corresponding investigation and his violations were deemed unintentional. Jackson received a written reprimand after he used profane language and violated the BWC policy after an accident investigation, but Jackson didn't issue a ticket to the citizen involved and Chief Thomas didn't make the disciplinary decision in any case. Weston's misconduct, while reprehensible, bears no resemblance to Plaintiff's own—he was suspended and ultimately terminated for inappropriate and harassing behavior towards women. Craig initially received counseling and a suspension after multiple BWC violations, none of which were elevated to Chief Thomas's consideration. And as described, when an IA investigation concluded that Craig intentionally turned off his dash-cam to speed without detection, Chief Thomas fired him. Finally, Johnson was suspended after a BWC violation in 2018, before Thomas arrived. In sum, none of these cases are materially similar to Plaintiff's own.

Plaintiff cannot make out a *prima facie* case of race discrimination for the reason just articulated, but even assuming that he could, his claim still fails. If a plaintiff successfully establishes such a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Lewis*, 918 F.3d at 1221. If the defendant does so, the plaintiff is then given a final opportunity to show that the defendant's proffered nondiscriminatory reasons were

merely a pretext for discriminatory intent. *Id.* A plaintiff cannot establish pretext by simply presenting facts that suggest discrimination, but must instead specifically respond to the employer's explanation and rebut it. *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007). Importantly, an employer's reason is not pretextual unless it is shown *both* that the reason was false, *and* that an unlawful motive like discrimination was the real reason. *Gogel v. Kia Motors Manuf. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (*en banc*).

Chamblee has presented a legitimate rationale for the decision to end Plaintiff's employment. Specifically, Plaintiff was found to have committed several policy violations which, when considered collectively, gave the appearance of biased policing. That is sufficient. So, the burden shifts to Plaintiff to show Chamblee's rationale was false and, further, that race discrimination was in fact the real motivation. *See Gogel*, 967 F.3d at 1136. He hasn't done so. In order to establish pretext, a plaintiff must establish "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (citation omitted). In other words, the plaintiff must present evidence that would allow a jury to conclude the employer is lying. *See Scott v. Shoe Show, Inc.*, 38 F. Supp. 3d 1343, 1363 (N.D. Ga. 2014) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a

phony reason for some action." (citation omitted)). "Thus, the inquiry is limited to whether the employer offered an honest, [non-discriminatory] explanation for terminating the employee, regardless of whether the decision might have been mistaken." *Id.* (citations omitted). It is not enough to simply quarrel with the wisdom of the employer's rationale. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Yet, that is precisely what Plaintiff has done.

At his deposition, Plaintiff offered explanations in his defense to rebut each of the policy violations that underlaid his termination, but none of those explanations belie the good faith of Chief Thomas's decision or the investigative efforts that preceded it. For instance, Plaintiff claims he turned his BWC off during the accident investigation because, based on his reading of CPD policy, he was not supposed to record any conversations with other officers. Fair enough. But Lt. Newberry, Capt. Ford, Asst. Chief Beller, and Chief Thomas *all* disagreed with Plaintiff's reading at their respective depositions.[13] (Newberry Dep. at 106–07; Ford Dep. at 62–66, 89–

---

[13] As relevant, the BWC policy states that "Officers will activate the BWC to record all contacts with citizens in the performance of official law enforcement duties." (Doc. 46-4 at 65, § B.1). Such duties include "accident investigations," and officers are instructed that "BWCs shall remain activated until the event is completed in order to ensure the integrity of the recording." (*Id.* §§ B.1, B.3). The BWC policy does create some exceptions, however—for instance, because "BWCs shall be used only in conjunction with official law enforcement duties," the policy provides that officers generally should not use BWCs to record "[c]ommunications with other police personnel" and "[e]ncounters with undercover officers or confidential informants." (*Id.* §§ D.1, D.2). Lt. Newberry, Capt. Ford, Asst. Chief Beller, and Chief Thomas all indicated that the BWC policy exceptions would not be triggered by a routine accident investigation involving the presence of other officers. *See* (Newberry Dep. at 106–07; Ford Dep. at 62–66, 89–90; Beller Dep. at 24–26; Thomas Dep. at 90–93).

90; Beller Dep. at 24–26; Thomas Dep. at 90–93). So, even granting that Plaintiff's understanding of the BWC policy was a reasonable and permissible one, he is unable to show that it was the only one. Next, he asserts that his conduct towards Cherry at the accident scene was professional, even if brusque, and no less professional than conduct sometimes displayed by other CPD officers. Here too Plaintiff merely expresses a disagreement. Maybe Plaintiff's conduct was on par with the average CPD officer during the average accident investigation. Even so, he has failed to show that Chief Thomas and the investigators before him couldn't have reasonably expected more, particularly in a situation where he knew the citizen involved was injured. Plaintiff points out that Chamblee's personnel policy states that discipline should be used to correct rather than punish misconduct, but it also explains that disciplinary action—up to and including termination—should be appropriate to the seriousness of the offense. (Doc. 56 at 2). And here, while Plaintiff disagrees with the result, the uncontroverted evidence shows that Chief Thomas (and Asst. Chief Beller before him) believed the seriousness of Plaintiff's collected misconduct merited termination.

Plaintiff also insists it was reasonable for him to rely principally on the testimony of an impartial third-party witness to determine fault at the accident scene. Again, perhaps so. But Plaintiff has failed to demonstrate that it was unreasonable for Chief Turner to conclude, to the contrary, that Plaintiff improperly jumped to his

conclusion—especially where Plaintiff made his initial assessment before speaking to the drivers involved, and BWC footage showed that he later spoke at length with SSPD personnel and changed his mind multiple times. Finally, while Plaintiff acknowledges he did not submit a written statement during the initial line investigation, he claims he didn't realize the request to do so was urgent and that, later during the IA investigation, he forwarded a copy of the statement in any case. Regardless, the bottom line is that Plaintiff did not provide his written statement until two weeks after it was initially requested, at the earliest, and even if he did in fact forward the statement at that time, as he claims, not a single person at the CPD—whether Lt. Waasdorp, Lt. Newberry, Asst. Chief Beller, or Chief Thomas—believed he did. And in this context, that is ultimately what matters. Put another way, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Gogel*, 967 F.3d at 1148 (citation omitted); *see also Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (explaining that the fact that an employee did not engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong); *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 754 (11th Cir. 2017) ("Title VII concerns actual knowledge, and real intent, not constructive knowledge and assumed intent, which means [courts] must focus on the actual knowledge and actions of the

decision-maker." (quotation marks and citation omitted)).

Plaintiff has voiced strong disagreement with Chamblee's rationale for terminating his employment, but he hasn't presented enough evidence to establish the falsity of that rationale. Nor has he shown that discrimination was in fact the real reason for his discharge. The initial line investigation, which noted policy violations and inconsistencies in Plaintiff's statements that created a "negative" impression of the CPD, was conducted by Plaintiff's two Caucasian supervisors. The ensuing IA investigation was ordered by the Caucasian Asst. Chief and conducted by a Caucasian investigator, who found that Plaintiff committed four policy violations and had neglected his duty to investigate the accident in a fair and impartial manner while making a biased ticket decision. The IA report findings were then approved by the Asst. Chief, who recommended Plaintiff's termination. To be sure, Chief Thomas, an African-American, was the sole person who ultimately decided to terminate Plaintiff's employment. But the investigative efforts, findings, and recommendation that preceded his decision were all made by Caucasian personnel, and Chief Thomas's decision was even affirmed on administrative appeal by the Caucasian City Manager. The just-described demographics are not dispositive against Plaintiff, but they certainly don't help his cause. *See Holston v. Sports Auth., Inc.*, 136 F. Supp. 2d 1319, 1335 (N.D. Ga. 2000). ("[W]hen the decision makers are in the same protected class as the employee complaining about an adverse

employment decision, the employee faces a more difficult burden in establishing that a discriminatory animus played a role in the decision complained about."). That is especially true where, as here, there is simply no record that Chief Thomas or anyone else at the CPD ever made racially discriminatory comments, to Plaintiff or otherwise. And Plaintiff hasn't shown, as would be relevant, that he was replaced by a non-Caucasian officer. *See Ward v. Troup Cnty. Sch. Dist.*, 856 F. App'x 225, 228 (11th Cir. 2021) ("Because Plaintiff identified no similarly-situated comparator who was treated more favorably than he was—and because he was replaced by a person of the same race—the district court concluded properly that Plaintiff failed to establish a prima facie case of race discrimination.").

To fill the gap and create an inference of discriminatory intent, Plaintiff relies on Sgt. Bodron's declaration, comparator evidence, and the results of a 2022 workplace survey taken by Chamblee employees. (Doc. 58). Sgt. Bodron's declaration and the comparator evidence have already been dealt with—neither can satisfy the requisite inferential demands. As for the survey, it was administered to employees across several of the City's departments, including Administration, Planning and Development, Public Safety, and Public Works. (*Id.* at 3). The survey attempted to gauge employee sentiments on a variety of workplace factors, including employee engagement, management and leadership, communication, and—as most relevant here—favoritism. (*Id.* at 4–5). Apparently 85% of Chamblee's employees

participated. (*Id.* at 2). Of those workplace factors included in the survey, employees within the Public Safety Department—which included the CPD, among other offices—indicated that favoritism represented the most significant problem. (*Id.* at 23). The survey results do not, however, elaborate on that finding—for example, by showing the percentage of CPD officers who participated, by defining what is meant by favoritism, or by explaining whether the term encompassed race discrimination. That is a critical omission—this is, after all, a race discrimination case. Favoritism may encompass racism, but the two terms are not synonymous. [14] *See Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990) ("To hold that favoritism . . . is *per se* violative of Title VII would be, in effect, to rewrite federal law." (citation omitted)). So, absent additional evidence that the City's survey results have any bearing on the issue of race at the CPD, generally, or the question of whether Chief Thomas factored race into his employment decisions, specifically, the undersigned finds the survey has no probative value whatsoever. *See Ogletree v. City of Auburn*, 619 F. Supp. 2d 1152, 1170 (M.D. Ala. 2009) (explaining that, "[t]o be statistically meaningful on the issue of pretext, . . . there must be a way to discern" whether the statistics "are the result of legitimate or

---

[14] Notably, the survey also appears to have measured employee responses to the following statement, much more relevant to this case: "Diversity of race, ethnicity, gender and sexual orientation are respected in the organization." *See* (Doc. 58 at 28). The Public Safety Department did not score low on this factor. *See* (*id.* at 23).

racially-discriminatory variables").

To summarize, Plaintiff has failed to present a suitable comparator as required to make out a *prima facie* case of race discrimination, and in any event, he hasn't presented sufficient evidence to suggest Chamblee's rationale for his termination was pretextual. Therefore, Plaintiff's claim falls short under the *McDonnell Douglas* framework.

### b. Convincing Mosaic Standard

Moving on, Plaintiff's principal argument in opposition to summary judgment is that the collected evidence reasonably suggests race discrimination. A "convincing mosaic" of discrimination may be shown by evidence that demonstrates, among other things, (1) the employer's justification is pretextual, (2) "suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn," or (3) systematically better treatment of similarly situated employees. *Lewis*, 934 F.3d at 1185.

Much of the preceding discussion can be carried forward with equal force here. As already explained, Plaintiff hasn't succeeded in presenting evidence to support an inference of pretext. Chief Thomas's decision to terminate Plaintiff's employment didn't occur on a whim—instead, it capped an extensive, multi-level investigatory process. There is, correspondingly, extensive evidence documenting the findings that led to and supported the decision. Although Plaintiff insists the

outcome was unwarranted, the evidence relevant to Chief Thomas's decision includes no hint of discriminatory animus. Moreover, there was nothing suspicious about the timing of Plaintiff's termination, given that it took place following completion of the aforementioned investigatory process, which was itself prompted by a citizen complaint. And to reiterate, Plaintiff has not identified any suspicious anomalies in that process—for instance, no racially charged comments, ambiguous statements, procedural missteps, or unsupported findings.

Nor has Plaintiff presented evidence reasonably suggesting that Caucasians were systematically mistreated at the CPD. Plaintiff contends the disciplinary records he presented—which purportedly show non-Caucasian officers were repeatedly given second chances and comparatively modest disciplinary actions— can demonstrate that, as a matter of practice, Caucasians were disciplined more harshly. Although a looser comparative standard applies under the convincing mosaic approach, the evidence adduced serves Plaintiff no better here than previously, as he hasn't shown the comparators were similar enough in either instance. *See Daneshpajouh v. Sage Dental Grp. Of Fla., PLLC*, No. 21-13202, 2023 WL 334574, at *3 (11th Cir. Jan. 20, 2023) ("To create an inference of intentional discrimination, comparator evidence, even under a convincing mosaic theory, has to be 'similarly situated.'"). The following discussion will elaborate on that point, but it bears noting upfront that Plaintiff himself received little to no disciplinary action

for several prior incidents, including an inadvertent BWC violation. In other words, second-chances weren't as partial as he contends.

In any case, Plaintiff has conceded that several of the 50 comparators for whom he has submitted records need not be considered. *See* (Doc. 91 at 3). And six of the others—to repeat, the only ones Plaintiff specifically referenced in his summary-judgment briefing—have already been discussed at length above. Of the roughly dozen or so comparators that remain, some are either Caucasian (*i.e.*, within Plaintiff's protected class) or were disciplined by someone other than Chief Thomas. *See* (Doc. 92 at 10–11). But just as important with respect to this remaining set of comparators is the point made above—it is decidedly not the Court's role to survey Plaintiff's evidence and make his arguments for him. Plaintiff insists the hundreds of pages of disciplinary records show systematic mistreatment, but he doesn't actually make the case. Plaintiff's argument amounts to this: I was treated worse than others, see for yourself. That cannot sustain his claim. *See RTC*, 43 F.3d at 599; *Chavez*, 647 F.3d at 1061; *Stevenson*, 2021 WL 2677018, at *2.

Plaintiff leans heavily on the Eleventh Circuit's decision in *Jenkins v. Nell* to press his claim under the convincing mosaic theory, but his reliance is misplaced. A quick summary of the facts and holding in *Jenkins* underscores, by comparison, the shortcomings in Plaintiff's own case. In *Jenkins*, a Caucasian crane operator sued his employer for race discrimination after he was terminated by an African-

American supervisor. 26 F.4th at 1246. The Eleventh Circuit concluded that the plaintiff failed to make out a *prima facie* case under the *McDonnell Douglas* standard because none of the specific comparators he identified had engaged in materially similar misconduct. *Id.* at 1250. However, the court found that the plaintiff had nevertheless successfully presented a convincing mosaic of race discrimination. *Id.* at 1251. The court reasoned that the plaintiff's comparators, while not "strict comparators," were close enough in terms of misconduct that their comparatively favorable treatment could be construed to support an inference that the plaintiff's supervisor had discriminated against him based on race. *Id.* Importantly, however, the comparator evidence in *Jenkins* did not stand alone. Rather, it was enveloped by other evidence showing the following: the supervisor who terminated the plaintiff had previously confronted him about a workplace complaint; the supervisor became "visibly upset and angry with wide eyes and quivering lips" during the encounter; the supervisor sent the plaintiff home afterward and reported him to human resources; the supervisor had bragged that he was "close with HR;" the plaintiff was not given an opportunity to present his side of the story during the ensuing investigation; the plaintiff's only recourse after termination was an appeal to human resources; the supervisor previously made racially-biased comments; and, finally, no less than 18 Caucasian employees had retired, resigned, or transferred since the supervisor took over. *Id.* at 1247–48, 1251.

The evidence presented in *Jenkins* was both more extensive and more probative than that presented here. In *Jenkins*, the evidence clearly established some measure of personal animus on the part of the plaintiff's supervisor. The remaining question, then, was whether that animus was tainted by unlawful race considerations. Here, by contrast, there is zero suggestion that Chief Thomas or any of the other CPD personnel involved in the investigation had any personal axe to grind with Plaintiff, for any reason. Furthermore, turning to the question of a race-based motive, here's how the comparison stacks up. In *Jenkins*, the supervisor had previously made racially-biased comments. Here, there were none. In *Jenkins*, the plaintiff didn't get a chance to explain himself during an investigation into his conduct and his only appeal following termination was to human resources, with whom the supervisor had a close relationship. Here, Plaintiff's conduct was investigated by three persons at two different levels, he was interviewed twice, he was specifically directed to submit a written statement in his defense (which he never confirmed was received), and he appealed his termination to the independent City Manager. In *Jenkins*, at least 18 Caucasian employees left the supervisor's command for various reasons related to the supervisor's conduct. Here, by contrast, there is no evidence Caucasian officers have left Chief Thomas's command in disproportionate numbers—in fact, it is undisputed that Chief Thomas has terminated eight non-Caucasian officers versus two Caucasian officers since his appointment. (Doc. 50 ¶ 45). So, even if the

44

CPD's disciplinary actions were not entirely uniform and consistent—though, to be clear, Plaintiff hasn't actually shown as much—this case lacks the other important hallmarks of discrimination that were present in *Jenkins*.

To circle back to the beginning of the discussion while summarizing the findings reached in the interim, Plaintiff has not presented sufficient evidence to create an inference of unlawful race discrimination. He has zealously defended the reasonableness of his actions while casting general aspersions on the CPD's employment practices and challenging the appropriateness of his termination. But Plaintiff's efforts miss the mark. This case isn't about whether he should have been fired—it is *only* about whether Plaintiff was in fact terminated because of his race. *See Gogel*, 967 F.3d at 1148 ("[T]he role of this Court is to prevent unlawful [employment] practices, not to act as a super personnel department that second-guesses employers' [legitimate] judgments. Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." (citation omitted)). Plaintiff has succeeding in showing, at best, that he was a competent officer who made some unfortunate missteps on the job. Those inferences fall in his favor, but they fall well short of the threshold necessary to send his case to a jury. Accordingly, the undersigned **RECOMMENDS** that Chamblee's motion for summary judgment **GRANTED** as to Plaintiff's Title VII race discrimination claim (Count I).

### *ii. Fourteenth Amendment and Section 1981*

In addition to Title VII, Plaintiff claims Chamblee violated the Fourteenth Amendment and Section 1981 when it terminated his employment. As noted above, such claims must be brought under 42 U.S.C. § 1983. And when a plaintiff sues a municipality directly under this statute, he must establish that a governmental policy or custom caused his injury. *See Lewis*, 934 F.3d at 1190.

Plaintiff's additional discrimination claims fail, for two reasons. First, because these claims share legal elements with Title VII, they suffer from the same shortcomings detailed above. *See Lewis*, 934 F.3d at 1185; *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) ("[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."). Second, the relevant evidence in this case has been surveyed at length by this point and, for reasons already stated, that evidence fails to show an official policy or widespread custom of racially discriminatory discipline at the CPD.

Accordingly, the undersigned further **RECOMMENDS** that Chamblee's motion for summary judgment also be **GRANTED** as to Plaintiff's Fourteenth Amendment (Count II) and Section 1981 (Count III) race discrimination claims.

### IV. CONCLUSION

For the reasons stated above, the undersigned **ORDERS** and

**RECOMMENDS** the following:

1. Plaintiff's post-briefing motions for leave to file, (Docs. 94, 96), are **DENIED**; and

2. It is **RECOMMENDED** that Chamblee's motion for summary judgment, (Doc. 40), should be **GRANTED**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

IT IS SO **RECOMMENDED** on this 31st day of January 2023.

REGINA D. CANNON
United States Magistrate Judge

47