IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHNATHAN A. AZAR,
    Plaintiff,

v.

CITY OF CHAMBLEE, GA,
    Defendant.

Civil Action No.
1:21-cv-04655-SDG

## OPINION AND ORDER

This matter is before the Court on the Final Report and Recommendation (R&R) of United States Magistrate Judge Regina D. Cannon [ECF 98], which recommends that Defendant City of Chamblee's (Chamblee) summary judgment motion [ECF 40] be granted. Plaintiff Johnathan Azar objected to the R&R [ECF 100] and Chamblee responded [ECF 103]. Azar then sought leave to file a reply to Chamblee's response [ECFs 104, 105]. After careful consideration of the record, Azar's motions for leave are **DENIED**, his objections are **OVERRULED**, and Judge Cannon's R&R is **ADOPTED** in its entirety as the Order of this Court.[1]

---

[1]    This Court condemns in the strongest possible terms the thinly veiled assertion of bias against the Magistrate Judge contained in Plaintiff's objections. ECF 100, at 3 n.2.

I.      **Applicable Legal Standards**

A party challenging a report and recommendation issued by a United States Magistrate Judge must file written objections that specifically identify the portions of the proposed findings and recommendations to which an objection is made and must assert a specific basis for the objection. *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). The district court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *Jeffrey S. ex rel. Ernest S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990).

The district court has broad discretion in reviewing a magistrate judge's report and recommendation. In addressing objections, it may consider an argument that was never presented to the magistrate judge, and it may also decline to consider such an argument. *Williams v. McNeil*, 557 F.3d 1287, 1290–92 (11th Cir. 2009). Further, "[f]rivolous, conclusive, or general objections need not be considered by the district court." *Schultz*, 565 F.3d at 1361 (quoting *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988)).

II.     **Factual Background**

Azar does not generally dispute the recitation of the undisputed facts in the R&R—that is, his objections are not based on any allegedly incorrect description

of the facts. He instead asserts that the Magistrate Judge improperly weighed evidence, declined to consider material facts that create a dispute for trial, and misapplied the law.[2] As such, and except to the extent discussed below, the Court relies on the Factual Background set forth in the R&R.[3]

## III.   Discussion

Azar first asserts that a grant of Chamblee's summary judgment motion would improperly deny him his right to a jury trial—claiming that "Summary Judgment has been used as a weapon by Defendants, and sometimes the court itself, to deny plaintiffs their right to have their case heard by a jury."[4] Though jumbled and somewhat disjointed, Azar further objects to the R&R because it purportedly

- Improperly concluded that he did not make out a *prima facie* case under the *McDonnell-Douglas* test;

- Failed to consider evidence showing a convincing mosaic of circumstances; and

- Disregarded disputes of material fact concerning pretext.[5]

---

2   ECF 100, at 3–5.

3   ECF 98, at 2–14.

4   ECF 100, at 2 (citation omitted). *See generally id.* at 2–3.

5   *Id.* at 3–5.

The Court notes that Azar's objections are 47-pages long—well in excess of the page limit for briefs under the Local Rules. LR 7.1(D), NDGa. He did not seek leave for his overlong filing, continuing his disregard for this Court's rules, an issue that was amply detailed in the R&R.[6] It is Azar's own failure to follow those rules that underlays many of his objections. Nonetheless, the Court considers the entirety of Azar's objections.

### A.   Right to Jury Trial

Azar argues that, because there is a "strong preference" for jury trials, Chamblee should not be granted summary judgment.[7] First, since this case is governed by the Federal Rules of Civil Procedure, Azar's attempt at persuasion using Georgia's Civil Practice Act falls flat.[8] "[T]he right to a jury trial in federal courts is to be determined as a matter of federal law." *Ford v. Citizens & S. Nat'l Bank, Cartersville*, 928 F.2d 1118, 1121 (11th Cir. 1991) (quoting *Simler v. Conner,* 372 U.S. 221, 222 (1963) (per curiam)).

Second, and as this Order makes clear, Azar has not demonstrated the existence of a dispute of material fact that must be decided by a jury. A grant of

---

[6]   ECF 98, at 14–15.

[7]   ECF 100, at 1–3.

[8]   *Id.* at 9 n.8

summary judgment is therefore appropriate. Azar's hyperbolic complaints about the purported "weaponization" of the summary judgment process require no extensive discussion. *Schultz*, 565 F.3d at 1361. Suffice it to say

> a district court's resolution of a case based on a matter of law, before trial, does not violate the Seventh Amendment. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919–20 (11th Cir. 2018) (holding that summary judgment before trial does not violate the Seventh Amendment); *Garvie v. City of Ft. Walton Beach, Fla.*, 366 F.3d 1186, 1190 (11th Cir. 2004) (same); *see also Oglesby v. Terminal Transp. Co., Inc.*, 543 F.2d 1111, 1113 (5th Cir. 1976) ("No constitutional right to trial exists when . . . [no] dispute of material fact exists which a trial could resolve.").

*Miller v. Byers*, 833 F. App'x 225, 228 (11th Cir. 2020) (per curiam) (omission in original) (footnote omitted). This frivolous objection is therefore overruled.

## B.   Exclusion of Evidence

As the R&R notes, between September 28 and October 6, 2022, Azar submitted 39 separate filings in response to Chamblee's motion for summary judgment, the vast majority of which were untimely.[9] Certain of the October 5 and 6 submissions were "corrected" filings.[10] Faced with this "deluge," Judge Cannon

---

[9]   ECF 50 through ECF 88; ECF 98, at 14, 14 n.6 (describing the filings).

[10]   *See, e.g.*, ECFs 83 (notice of filing corrected response to SJM), 86 (notice of filing corrections to Exhibit 6), 88 (notice of filing corrected response to SJM).

provided Azar the opportunity to file "a concise index specifically identifying those documents he wished the Court to consider" in connection with Chamblee's summary judgment motion.[11] Judge Cannon's Order made clear that any filings not identified in the index would not be considered.[12] Azar filed such an index,[13] but requested leave to file yet more evidence about three weeks later.[14] Two weeks after that, he sought leave to file a surreply brief.[15] Azar now objects that Judge Cannon erred by refusing to consider this untimely evidence.[16]

### 1.    Excusable Neglect

Azar asserts that some filings were "late" because of the "enormous number of documents to file," problems with the filing system, and illness among his counsel's staff. He argues that no one suffered any prejudice as a result of his delays.[17] Prejudice, however, is not the appropriate standard. When a party seeks

---

[11]   ECF 90.

[12]   *Id.* at 2.

[13]   ECF 91.

[14]   ECF 94.

[15]   ECF 96. Despite his assertion that the denial of his motion for leave to file a surreply excluded "extremely important information to Plaintiff's case" (ECF 100, at 7 n.5), Azar does not object to that denial.

[16]   ECF 100, at 6–21.

[17]   *Id.* at 6 n.3, at 9 n.8.

to extend the time to do something *after* the original deadline, he must do so by motion and show excusable neglect. Fed. R. Civ. P. 6(b)(1)(B). At no point from September 28 through October 6, 2022 did Azar seek leave to make his untimely filings or file a motion showing excusable neglect for his lateness.[18] Azar's failure to abide by the clear September 28 deadline for filing his response to the summary judgment motion means he cannot establish excusable neglect. *Silas v. Sheriff of Broward Cnty.*, 55 F.4th 872, 877 (11th Cir. 2022).

Rather than disregarding *everything* that was not timely filed, Judge Cannon provided Azar the opportunity to file an index identifying the exact filings on which he wanted the Court to rely in response to Chamblee's summary judgment motion.[19] This indulgence was within the Court's discretion to control the case before it:

> "[W]e stress the broad discretion district courts have in managing their cases . . . [and] ensur[ing] that their cases move to a reasonably timely and orderly conclusion. This discretion is not wholly unfettered, but it is and must be broad." *Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358, 1360 (11th Cir. 2002) (citations omitted); *see also Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1269 (11th Cir. 2001) ("[W]e accord district courts broad discretion over the management of pre-trial activities, including discovery and scheduling."); *Chudasama v. Mazda Motor*

---

18   *See generally* Docket.

19   ECF 90.

> *Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997) ("[D]istrict
> courts enjoy broad discretion in deciding how best to
> manage the cases before them."); *United States v.*
> *McCutcheon*, 86 F.3d 187, 190 (11th Cir. 1996) (explaining
> that a district court is given "broad discretion . . . to
> manage its own docket").

*Watts v. Club Madonna, Inc.*, 784 F. App'x 684, 688 (11th Cir. 2019) (alterations and omissions in original). There was no legal error in the R&R's refusal to consider the untimely evidence that was not listed on Azar's index—including the *signed* declaration of Sgt. Robert Bodron.

### 2.     The Bodron Declaration

In addition to his general assertion that the R&R failed to consider his untimely evidence, Azar specifically objects to the Magistrate Judge's refusal to rely on an unsigned declaration purporting to be from Bodron and the untimely, *signed* Bodron declaration.[20] In support of his opposition to summary judgment, Azar filed the unsigned declaration.[21] Azar also listed that unsigned declaration on his "index" of materials Judge Cannon should consider in connection with his

---

[20]   ECF 100, at 6–18.

[21]   ECF 54.

opposition.[22] Nearly three weeks later, Azar filed a motion for leave to file the executed version of the declaration,[23] which Judge Cannon denied.[24]

### i. Timeliness

Having sought leave to file the signed declaration after the deadline, it was incumbent on Azar to show excusable neglect. Fed. R. Civ. P. 6(b)(1)(B). There was no error in the R&R's conclusion that he failed to do so. Azar's objections contend that "Bodron literally disappeared" and Azar and his counsel were unable to secure his signature by the deadline.[25] But there are no details about the efforts they undertook to locate Bodron and no indication that they sought an extension of time from the Court in order to secure this evidence—despite the fact that Azar had previously sought and was granted an extension of the summary judgment response deadline to obtain documents though an open records request.[26] When he sought this additional time, Azar made no mention of any problems he was having locating Bodron or securing his signature.[27] Having apparently declined to

---

22  ECF 91, at 2.

23  ECF 94.

24  ECF 98, at 47.

25  ECF 100, at 8. *See also id.* at 8–9.

26  ECF 44.

27  *Id.*

depose Bodron during discovery, Azar could have sought relief under Fed. R. Civ. P. 56(d): "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." He did not seek such relief and made no effort to explain his alleged inability to track down Bodron until after the deadline for responding to summary judgment.

Azar asserts he has found "no rule that would prohibit this Court from considering" the declaration because it was untimely.[28] While that may be true in its strictest sense, it is also entirely misleading. There is no rule that *requires* the Court to consider the untimely declaration in the absence of a showing of excusable neglect. Fed. R. Civ. P. 6(b)(1)(B). If, as he claims, Azar could properly testify to all but one of the facts in Bodron's unsigned declaration, then it is unclear how Azar was prejudiced by the refusal to consider the signed declaration, especially when Judge Cannon declined to strike Azar's own declaration.[29]

---

[28]   ECF 100, at 9.

[29]   ECF 98, at 23.

### *ii.*    Admissibility

Even if the signed Bodron declaration had been timely, Judge Cannon correctly concluded that the vast majority of its contents was not based on personal knowledge or admissible in evidence.[30] Azar objects that the declaration should have been considered because Bodron's testimony would be admissible at trial.[31] Azar, however, fails to explain how that is true. In fact, most of the section in Azar's objections that is supposed to be dedicated to showing that the Bodron declaration contains admissible evidence addresses a myriad of other issues, including alleged comparators, whether Azar should have been terminated in the first place, and whether the underlying investigation into Azar's conduct was appropriate.[32] Even a cursory review of the declaration shows that it is not generally admissible. There was no error in the R&R's refusal to consider it— whether signed or unsigned.

For instance, Bodron recounts his understanding of what Azar did and thought.[33] Bodron speculates that Azar would not have been terminated if he were

---

30    *Id.* at 19–20.

31    ECF 100, at 10.

32    *Id.* at 10–18.

33    ECF 94-2, ¶ 40.

not white.[34] The declaration provides no facts that can support that supposition, since Bodron did not make the decision to fire Azar and Bodron does not explain how he had any knowledge of all the facts relevant to why any officers received the punishments they did.[35] Bodron also asserts that unqualified African Americans were hired by the police department rather than more qualified white officers.[36] Other than recounting that he himself scored higher on a test than an African American applicant who had not been with the Chamblee police department as long, Bodron provides no facts supporting his claim that the other officer was promoted over him because of race.[37] Bodron does not identify the criteria that were considered when hiring for the position, who the decision makers were, what all of his own qualifications were, or what the African American's other qualifications were. "Conclusory allegations have no probative value unless supported by specific facts." *James v. City of Montgomery*, 823 F. App'x 728, 731 (11th Cir. 2020) (finding no error in district court's refusal to consider allegations about less qualified white men as conclusory and speculative) (citing

---

[34]   *Id.* ¶ 4.

[35]   *Id.* ¶¶ 51–53 ; *see also generally* ECF 98, at 19–22.

[36]   ECF 94-2, ¶¶ 6–7.

[37]   *Id.* ¶ 7.

*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000)). Bodron's testimony is long on speculation and innuendo, but short on specific facts. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Bodron's declaration fails this requirement.

### C.   Azar Did Not Show a *Prima Facie* Case Under *McDonnell Douglas.*

Under the *McDonnell-Douglas* framework, the employee carries the initial burden of establishing a *prima facie* case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Azar does not object that the R&R incorrectly described the applicable law. Rather, he contends that the R&R incorrectly concluded he had not shown that his comparators were treated more favorably.[38]

To be a comparator, the person must be "similarly situated in all material respects" to the plaintiff and have been treated more favorably. *Lewis v. City of Union City*, 918 F.3d 1218, 1224 (11th Cir. 2019) (en banc). When the purported comparators work in different departments, under different supervisors, or are

---

[38]   ECF 100, at 40–41.

subject to different rules than the plaintiff, it will be difficult for the plaintiff to make the necessary showing. *Nealy v. SunTrust Bank*, 2021 WL 5112819, at *2 (11th Cir. Nov. 3, 2021) (per curiam) ("Nealy's comparators worked in different departments under different supervisors with different rules. It's difficult to see how SunTrust treated similarly situated employees outside Nealy's class more favorably when Nealy's comparators weren't subject to the same policy."); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("[M]easures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). Azar's *prima facie* case fails, as the R&R concluded, because he did not identify appropriate comparators.

### 1. The Named "Comparators"

Azar's brief opposing summary judgment identified only six individuals as alleged comparators. The R&R addressed each one and determined that none was an actual comparator.[39] Azar generally objects that Judge Cannon failed to view evidence related to these individuals in his favor, but he has not provided any details to support such a contention.[40] And the Court finds no error in the R&R's

---

[39]   ECF 98, at 27–31.

[40]   ECF 100, at 19–21, 40–41.

determination.[41] 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Moreover, under *McDonnell Douglas*, it was Azar's burden to show that he was similarly situated with the named individuals. *Lewis*, 918 F.3d at 1214. Viewing the evidence Azar presented in the light most favorable to him—as the R&R did—none of those individuals were similarly situated. Without such comparators, Azar cannot make out a *prima facie* case, and the *McDonnell Douglas* inquiry is at an end.

### 2.   The Comparator Chart and Highlights Chart

### i.   New Arguments

Azar objects to the R&R's refusal to consider his general references to unspecified comparators, and purported disregard of or failure to give the proper weight to the Comparator Chart (the Chart) and Comparator Highlights Chart (the Highlights).[42] Azar's primary argument seems to be that this evidence demonstrates that African Americans were treated less harshly than he was for more serious infractions: "The comparison that should be made is whether any other black employee was fired after being accused of Group One offenses."[43]

---

[41] ECF 98, at 28–32.

[42] ECF 100, at 11–13 (referring to ECF 55 (Chart); ECF 85 (Highlights)), 19–21, 40–41.

[43] *Id.* at 16–17.

Azar also objects that scores of black employees were supposedly "excused from Group Two and Group Three infractions, without notable consequence—even when they had *prior* similar infractions."[44] But Azar never made these arguments to the Magistrate Judge. He did not assert that his actual comparators should be other officers who had been accused of "Group One" offenses, nor does he identify any officer who fit that category or explain how any was similarly situated.[45] Instead, in opposing summary judgment, he contended that his comparators didn't really have to be similarly situated in all material respects and that he could still succeed on his claims without an actual comparator.[46] The Court will not now consider arguments that Azar could have, but did not, make in response to Chamblee's summary judgment motion. *Williams*, 557 F.3d at 1290–92.

### ii.    Failure to Marshal Evidence

In opposing summary judgment, Azar generally argued that white officers are treated differently than "non-white" officers, but he failed to point to any specific evidence in support of that assertion.[47] He referred to the Chart and

---

[44]   *Id.* at 11 (emphasis in original).

[45]   *See, e.g.*, *id.* at 11–13.

[46]   ECF 83-1, at 2–6.

[47]   *Id.* at 17–20.

Highlights (which purport to be summaries of hundreds of pages of disciplinary records, deposition testimony, and deposition exhibits) without specific explanations or precise citations.[48] The R&R declined to consider the unauthenticated charts and mass of undifferentiated evidence.[49]

In order to defeat summary judgment, it was Azar's burden to identify similarly situated comparators and explain how they were similarly situated in all material respects to establish a *prima facie* case of intentional discrimination. *Lewis*, 918 F.3d at 1222, 1224.

> [I]n making a prima facie showing of racial discrimination, the employee must name comparators who were "similarly situated in all material respects" and treated more favorably. We reasoned that such a comparator may be "subject to the same employment policy, guideline, or rule" and will ordinarily "have been under the jurisdiction of the same supervisor."

*Nealy*, 2021 WL 5112819, at *2 (quoting *Lewis*, 918 F.3d at 1224, 1227–28). Further, the proper comparator will have engaged in the same basic conduct and share the

---

[48]   *See, e.g., id.* at 18.

[49]   ECF 98, at 27 ("Plaintiff merely directs the Court's attention to the [alleged comparators'] collected disciplinary records, a chart listing what he believes are the pertinent details, and a collection of 'highlights' . . . . It should go without saying that 'point-and-conclude' is not an acceptable form of argument.") (citing *RTC v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). *See also id.* at 28 n.11 (noting that Azar failed to provide any evidence demonstrating the accuracy and completeness of the Chart and Highlights).

plaintiff's disciplinary history. *Lewis*, 918 F.3d at 1227–28. In short, "a plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)) (footnote omitted).

The documents list the name and race of various officers, and state what their purported offense and punishment were, but provide no meaningful way for the Court to assess the similarity of those officers' situations to Azar. For example, the first entry on the Chart relates to Benjamin Allen, and only lists his race, the three alleged offenses, and the purported disciplinary action taken.[50] Even if the Chart and Highlights were admissible under Fed. R. Evid. 1006 or could be reduced to admissible form—something that is by no means clear—there is nothing to demonstrate how the officers listed were materially similarly situated to Azar, whether they were subject to the same policy or rule as Azar, or if they had the same supervisor. Neither reflects how any alleged comparator was similarly situated to Azar in all material respects.[51]

---

[50]   ECF 55, at 1.

[51]   *See generally* ECFs 55, 85.

In opposing summary judgment, Azar focused on his "convincing mosaic" argument.[52] He merely pointed to the Chart and Highlights as "exemplify[ing] the disparity in how whites are treated in comparison to nonwhites,"[53] leaving it to the Court to formulate the arguments he should have presented and to parse through evidence that might or might not have any relevance. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted). *See also Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense."). There is no appropriate basis for the Court to rely on the Chart or Highlights in support of Azar's contention that he put forward suitable comparators. And there was no error in the R&R's refusal to do so.

### *iii.*    The Underlying Disciplinary Records

The "sources" for the information in the Chart and Highlights do not point to record evidence, but to Bates numbers, deposition transcripts, and deposition

---

[52]   ECF 83-1, at 2–6.

[53]   *Id.* at 18.

exhibits, making it difficult for the Court to accurately locate the supposedly supporting documents in the record. The citations do not point to specific pages, only to full (sometimes multi-page) documents. There are no pin cites when the source is a multi-page document. Those underlying documents themselves do not clearly show how the officers listed in the Chart and Highlights were similarly situated to Azar in all material respects.

Instead of directing the Court to relevant evidence, Azar wants the Court to "go fish" in the record. This is inappropriate. *Cf. Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1067, 1061 (11th Cir. 2011) ("Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him. The Seventh Circuit memorably said that appellate judges are not like pigs, hunting for truffles buried in briefs. Likewise, district court judges are not required to ferret out delectable facts buried in a massive record.") (citations and internal quotation marks omitted); *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) ("Local Rule 56.1 protects judicial resources by mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge. The rule also streamlines the resolution of summary judgment motions by focus[ing] the district court's

attention on what is, and what is not, genuinely controverted.") (citations and internal quotation marks omitted).

### iv.   Replacement

To the extent Azar objects that the R&R erred by determining that he could not make out a *prima facie* case because he was not replaced by someone outside of his protected class,[54] he mischaracterizes the R&R's conclusion. Judge Cannon clearly based her recommendation on Azar's failure to identify a similarly situated comparator.[55] Going even further, the R&R noted that Azar's claim would still have failed because he did not establish pretext.[56] It was in *that* context—a pretext analysis—where the R&R noted that evidence Azar was replaced by a nonwhite officer would have been relevant.[57]

### v.   Summary

Without suitable comparators, Azar cannot make out a *prima facie* case of race discrimination under *McDonnell Douglas*. Accordingly, his objections with

---

[54]   ECF 100, at 40 (citing ECF 98, at 38).

[55]   ECF 98, at 26–32.

[56]   *Id.* at 32–38.

[57]   *Id.* at 38 (citing *Ward v. Troup Cnty. Sch. Dist.*, 856 F. App'x 225, 228 (11th Cir. 2021)).

regard to pretext[58] are therefore irrelevant to whether he can satisfy the *McDonnell-Douglas* test, but are discussed below in connection with his convincing mosaic argument.

### D. Convincing Mosaic of Circumstances

Even when a plaintiff cannot make out a *prima facie* case under *McDonnell Douglas*, he can avoid summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted). But an inference "is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." *Id.* at 1328 n.25 (citation omitted).

> A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.

*Lewis*, 934 F.3d at 1185 (cleaned up). *See also Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014) (per curiam) (same).

---

58   ECF 100, at 44–47.

Azar objects that the R&R refused to consider certain evidence in support of his "convincing mosaic" theory, specifically the Bodron Declaration, the Comparator Chart, the Chamblee Employee Engagement Survey, Chamblee's policy manual, and notes from an exit interview with Officer Poythress.[59] He argues that everything identified on his "updated" index of materials in support of his opposition to summary judgment supports the mosaic.[60] He also asserts that there are disputed material facts demonstrating that Chamblee's reasons for his termination were pretextual.[61]

### i.   The Bodron Declaration and Comparator Chart

The Court has already addressed why the Bodron Declaration is inadmissible, and those reasons are equally applicable with regard to Azar's mosaic theory. The R&R expressly considered the Chart and disciplinary records on which it was supposedly based.[62] The R&R addressed all of the purported comparators on which Azar urged the Magistrate Judge to rely—including those comparators who were not specifically named in Azar's briefing.[63] To the extent

---

[59]   *Id.* at 4–5, 41–44.

[60]   *Id.* at 42 (citing ECF 94-4).

[61]   *Id.* at 44–47.

[62]   ECF 98, at 41–42.

[63]   *Id.* at 42.

Azar's objection is that the R&R did not consider the Chart in the light most favorable to him, Azar was required to show how his alleged comparators were similarly situated to him for the evidence to support a convincing mosaic theory. He failed to do so, so it's unclear how this objection can be supported. *Daneshpajouh v. Sage Dental Grp. of Fla., PLLC*, No. 21-13202, 2023 WL 334574, at *3 (11th Cir. Jan. 20, 2023) ("To create an inference of intentional discrimination, comparator evidence, even under a convincing mosaic theory, has to be 'similarly situated.'") (citing *Lewis*, 934 F.3d at 1185). Viewing the evidence in the light most favorable to Azar does not require the Court to simply assume the alleged comparators are in fact similarly situated—particularly when Azar made no effort to demonstrate any similarity.

### ii.    Favoritism

Azar objects to the R&R's refusal to consider the "Chamblee Employee Engagement Survey 2022" and Officer Poythress's exit interview.[64] The purported relevance of this evidence are the references to "favoritism."

---

[64]    ECF 100, at 5, 18–19.

### a.    Survey

According to the survey itself, it was completed by employees in 19 different departments of the City of Chamblee, including the police department.[65] As the R&R described: "Of those workplace factors included in the survey, employees within the Public Safety Department—which included the CPD, among other offices—indicated that favoritism represented the most significant problem."[66] The R&R found this of "no probative value" for several reasons.[67] There is no evidence about how many Chamblee police officers participated, what was meant by favoritism, or what the respondents meant by favoritism.[68] Azar objects that whether "favoritism" means "discrimination" goes to the weight the survey should be given by the jury, not to the admissibility of the evidence.[69] This Court disagrees.

Favoritism can, but need not necessarily encompass discrimination. *Favoritism*, Black's Law Dictionary (11th ed. 2019) ("Preference or selection, usu. invidious, based on factors other than merit. See nepotism; patronage; cronyism.

---

[65]    ECF 58, at 3.

[66]    ECF 98, at 39.

[67]    *Id.*

[68]    *Id.*

[69]    ECF 100, at 18–19.

Cf. discrimination."). But the only discrimination relevant here must be based on race. The survey results about favoritism does not obviously implicate race at all,[70] and include responses from bailiffs, E911, and park rangers in addition to the police department.[71] A jury could not properly infer from the survey results that the Chamblee Police Department engaged in intentional *racial* discrimination without indulging in speculation. *Smith*, 644 F.3d at 1328, 1328 n.25 (11th Cir. 2011) (citation omitted). Nor does Azar explain how the results of a survey conducted in 2022 have any bearing on his 2019 termination.

### *b.*   Exit Interview

The Poythress exit interview exhibit, which appears to reflect the interviewer's notes, references problems with "favoritism."[72] Even assuming this information could be reduced to admissible form, the exhibit is problematic for the same reasons as the survey—there is no indication that Poythress meant racial discrimination when he referred to favoritism. Nor do Azar's objections present any argument about how this document contributes to his convincing mosaic theory. Such general objections need not be considered. *Schultz*, 565 F.3d at 1361.

---

[70]   ECF 58, at 23.

[71]   *Id.* at 3.

[72]   ECF 59.

### *iii.* **Policy Manual**

Azar also objects to the R&R's failure to consider the Chamblee Personnel Policy Manual, claiming that the manual only makes the most severe infractions punishable by termination.[73] He also relies on the manual to support his assertion that his comparators should have been other employees accused of "Group One" offenses.[74] As noted above, Azar did not present to the Magistrate Judge his argument that comparators should be determined solely by the type of offense committed. The Court does not consider it now.

The R&R does briefly discuss the policy manual, concluding that it did not prove that Azar should not have been fired for his conduct.[75] The policy manual makes clear that "it is the City's intent to terminate the employment of those individuals . . . who engage in behavior that is so seriously detrimental to the City and its employees that immediate termination is called for."[76] At best, Azar has an argument that his termination may have been inconsistent with the policy manual. But "[a]n employer may terminate an employee for 'a good reason, a bad reason,

---

[73]   ECF 100, at 4, 16–17.

[74]   *Id.*

[75]   ECF 98, at 35.

[76]   ECF 56, at 2.

***a reason based on erroneous facts***, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Herron-Williams v. Ala. State Univ.*, 805 F. App'x 622, 631 (11th Cir. 2020) (emphasis added) (quoting *Flowers v. Troup Cnty., Ga. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)). So, while the policy manual may contribute to Azar's convincing mosaic theory, there is little else supporting it.

### *iv.*   **Pretext**

Azar objects to the R&R's conclusion that he failed to show pretext.[77] In doing so, he relies primarily on case law from outside of the Eleventh Circuit.[78] In this Circuit, however, a plaintiff can show pretext by:

> (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies.

*Lewis*, 934 F.3d at 1186 (citation omitted). Where the proffered reason for the employment action "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot

---

[77]   ECF 100, at 44–47.

[78]   *Id.* (citing Massachusetts Supreme Judicial Court, Seventh Circuit, and Illinois district court cases).

succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). But quarrel with Chamblee's reasoning is precisely what Azar does.

Chamblee's proffered reason for Azar's termination was as follows:

> [A]n investigation into a civilian complaint concluded that Azar had violated four distinct policies when he responded to a traffic accident and during the ensuing IA investigation. Police officers hold a position of trust and civic responsibility. As a police officer, Azar had a duty to conduct himself in a manner that would foster confidence and respect of the public and serve the community "in a kind, considerate, and patient manner." Ensuring a public image that is free of impropriety is especially important during times of public unrest and high distrust in law enforcement.[79]

Judge Cannon concluded that Azar did not present evidence that would allow a jury to conclude that Chamblee's proffered reason was pretextual.[80] Azar instead tried to explain away each of the policy violations he committed.[81] He presented no evidence suggesting that Chamblee's proffered reason was false. "The inquiry into pretext centers upon the employer's beliefs and not the employee's own

---

[79]  ECF 40-1, at 18. *See also* ECF 40-3, at 4–5 (appeal denial letter), 46-4 (internal affairs report), 48-5 (termination letter).

[80]  ECF 98, at 33–34.

[81]  *Id.* at 34–37.

perceptions of his performance." *Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 854 (11th Cir. 2019) (citation omitted).

A large part of Azar's corrected response to Chamblee's summary judgment motion is dedicated to arguing why the decision to terminate his employment was wrong.[82] But he never explains how those alleged errors are indicative of racially motivated decision-making.[83] Generic claims of "favoritism"[84] are not sufficient to meet Chamblee's proffered reason head on.

In his objections, Azar asserts that he "presented substantial evidence demonstrating the discriminatory treatment between White officers and non-White officers in the issuance of punishment."[85] The Court has already addressed why that evidence (the Chart and underlying disciplinary records) fails to show discriminatory treatment.[86] For those same reasons, it fails to suggest any racial motivation for Azar's termination. His focus on the "conflicting testimony" about the underlying traffic accident does not show that Chamblee's proffered reason is not the real reason for its employment decision.

---

[82]   ECF 83-1, at 7–17.

[83]   *See generally* ECF 83-1.

[84]   *Id.* at 18–20.

[85]   ECF 100, at 45.

[86]   *See supra* Section III.C.2.

Finally, Azar argues the R&R erred by "focusing solely on Thomas's alleged 'good faith,'" claiming that good faith is a jury question.[87] But the R&R uses the term only once—in discussing Chief Thomas's decision to terminate Azar's employment.[88] It was Azar's burden to show that Chamblee's proffered reason was not the real reason for his termination. Whether there is evidence that the ultimate decision-maker did not make the employment determination in good faith goes directly to a plaintiff's burden to show pretext. *Duckworth*, 764 F. App'x at 854. In this context, "good faith" isn't a jury question—it is part of the plaintiff's evidentiary burden to show that the employer's proffered reason for the employment decision was bogus.

> *v.*   **Summary**

Not only did Azar fail to rebut Chamblee's proffered reason for his termination, neither the Bodron Declaration, the Chart, the survey, the policy manual, nor the Poythress exit interview notes contribute to a convincing mosaic from which a jury could properly infer that intentional racial discrimination was the reason why Azar was fired.

---

87   ECF 100, at 46.

88   ECF 98, at 34.

### E.      Azar's Other Untimely Filings

Following his penchant for disregarding the Court's rules and inundating the Court with unauthorized filings, on March 16, 2023, Azar filed a motion for leave to file a reply to Chamblee's response to his objections.[89] That was two full weeks after Chamblee had filed its response.[90] On March 17, Azar filed another copy of that motion without explanation.[91] Five days after that, Azar filed a "notice" explaining that his March 16 filing failed to attach his proposed reply and that the March 17 filing corrected that omission.[92] Azar's motions for leave argue (again) that the Court should accept the untimely signed Bodron declaration.[93] Azar also asserts that Chamblee raised new issues in its response to his objections to which he should be able to respond.[94]

First, replies to responses to objections are not authorized by statute or the Federal Rules of Civil Procedure. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Second, the proposed reply is nearly 50 pages—double the number of pages

---

[89]   ECF 104.

[90]   ECF 103.

[91]   ECF 105.

[92]   ECF 106.

[93]   ECF 104, at 1.

[94]   *Id.*

permitted under the Local Rules for briefs, LR 7.1(D), NDGa, and longer even than his original objections. On top of that, the proposed reply appears to be a draft, replete with blanks for filling in citations and apparent internal notes for the drafters.[95] Third, it addresses far more than just the untimely Bodron declaration or alleged new arguments by Chamblee. In fact, Azar makes additional substantive arguments that could have been (and were actually) made in his objections, summarizes the purported evidence, asserts that the internal affairs investigation was biased, claims he presented proper comparators, and repeats his claims that he is entitled to have his case go to a jury.[96] Any one of these problems is a sufficient basis on its own to reject Azar's motions for leave, which are **DENIED**.

## IV.    Conclusion

Plaintiff's motions for leave [ECFs 104, 105] are **DENIED**, his objections [ECF 100] are **OVERRULED**, Defendant's Motion for Summary Judgment [ECF 40] is **GRANTED**, and the R&R [ECF 98] is **ADOPTED** as the Order of this Court.

---

[95]    *See, e.g.,* ECF 105-1, at 3, 4 nn. 1–5, 5 n.6, 5 n.9, 47–48.

[96]    *See generally* ECF 105-1.

The Clerk is **DIRECTED** to enter judgment in favor of Defendant and close this case.

**SO ORDERED** this 31st day of March, 2023.

Steven D. Grimberg
United States District Court Judge